Submitted on remand from the Oregon Supreme Court March 13, 2007, affirmed January 30, 2008

POLK COUNTY,
*Petitioner,*

*v.*

DEPARTMENT OF LAND CONSERVATION
AND DEVELOPMENT
and Kathy Thole,
*Respondents.*

Department of Land Conservation and Development
03WKTASK001541; A122385 (Control)

1000 FRIENDS OF OREGON,
*Petitioner,*

*v.*

LAND CONSERVATION
AND DEVELOPMENT COMMISSION,
*Respondent.*

Department of Land Conservation and Development
03WKTASK001541; A122732

176 P3d 432

David Doyle filed the briefs for petitioner Polk County.

Mary Kyle McCurdy filed the briefs for petitioner 1000 Friends of Oregon.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Denise G. Fjordbeck, Assistant Attorney General, filed the brief for respondents Department of Land Conservation and Development and Land Conservation and Development Commission.

Respondent Kathy Thole filed the brief *pro se*.

Before Landau, Presiding Judge, and Schuman and Ortega, Judges.

LANDAU, P. J.

**LANDAU, P. J.**

This case returns to us on remand from the Oregon Supreme Court for reconsideration in light of the court's opinion in *Kellas v. Dept. of Corrections*, 341 Or 471, 145 P3d 319 (2006). *Polk County v. DLCD*, 342 Or 344, 153 P3d 123 (2007). Petitioners Polk County and 1000 Friends of Oregon sought review of a Land Conservation and Development Commission (LCDC) order approving in part and remanding in part the county's amendment of its acknowledged comprehensive plan and land use regulations as a part of its periodic review (known as Work Task 3) to apply the Unincorporated Communities Rules, OAR 660-022-0000 to 660-022-0070,[1] to the unincorporated communities of Grand Ronde, Fort Hill, and Valley Junction. The county's decision focused on establishing the boundaries of the unincorporated communities and allowing increased development within them. In our first opinion, we affirmed LCDC's order on the county's petition and dismissed 1000 Friends' petition for lack of standing. *Polk County v. DLCD*, 199 Or App 501, 112 P3d 409 (2005). We now affirm LCDC's order on the merits of 1000 Friends' petition.

## I. BACKGROUND

ORS 197.652 to 197.658 permit planning jurisdictions to engage in a collaborative process known as "regional

---

[1] First enacted in October 1994, the Unincorporated Communities Rules, OAR 660-022-0000 to 660-022-0070, are intended to expedite the planning process for counties by reducing their need to take exceptions to statewide planning goals when planning and zoning unincorporated communities. OAR 660-022-0000. OAR 660-022-0070 provides:

"For each unincorporated community in the county, by January 1, 1998, or a date specified in a periodic review work program, all counties shall:

"(1) Plan for unincorporated communities under the requirements of this division; or

"(2) Demonstrate that all uses authorized by acknowledged comprehensive plans and land use regulations for unincorporated communities are rural, in compliance with statewide planning Goals 11 and 14; or

"(3) Amend acknowledged comprehensive plans and land use regulations to limit uses to those which are rural in compliance with statewide planning Goals 11 and 14; or

"(4) Adopt exceptions to statewide planning Goal 14, and Goal 11 if necessary, to allow urban uses on rural land."

problem solving" (RPS) to resolve common land use problems in an area. ORS 197.654. When jurisdictions rely on RPS, LCDC may acknowledge plan and rule amendments that

> "do not fully comply with the rules of the commission that implement the statewide planning goals, without taking an exception, upon a determination that:
>
> "* * * * *
>
> "(c) The agreement reached by regional problem-solving process participants and the implementing plan and amendments and land use regulations conform, on the whole, with the purposes of the statewide planning goals."

ORS 197.656(2). Work tasks that are completed through the RPS process are thus subject to a less rigorous review by LCDC for compliance with land use rules. Work tasks not completed through RPS are reviewed by LCDC for compliance with applicable administrative rules and statewide planning goals and applicable statutes. ORS 197.610 - 197.646.

The communities of Grand Ronde, Valley Junction, Fort Hill, and Willamina are close to or on the Polk and Yamhill counties border and share common growth issues. Work Task 3 was originally part of an RPS project involving multiple jurisdictions, including Polk and Yamhill Counties, the Confederated Tribes of the Grand Ronde, and the City of Willamina. However, before completion, Yamhill County and Willamina withdrew from the RPS process. The Yamhill County Commissioners concluded that "the problems initially identified in the region would be adequately addressed through the implementation of current Yamhill County Comprehensive Plan and Zoning Ordinance provisions for areas in Yamhill County and the provisions adopted by Polk County for those areas in Polk County." Thus, only lands within Polk County, including tribal lands, are involved in the amendments. Polk County nonetheless sought to have its plan amendments reviewed by LCDC pursuant to RPS.

As we said in *Polk County v. DLCD*, "the planning problems for which the RPS was convened inextricably involved Yamhill County." 199 Or App at 510. Because of Yamhill County's withdrawal, LCDC concluded that Polk

County's decision would not be reviewed under the RPS statutes. In the absence of RPS, LCDC concluded that the county's periodic review and Work Task 3 are subject to the rules implementing statewide planning goals. On the merits, LCDC approved in part and remanded in part the county's amendments.

The county and 1000 Friends both sought judicial review. The county asserted that LCDC erred in failing to review the county's amendments under RPS. We affirmed LCDC's determination of that issue in our first decision in this case.

In its petition, 1000 Friends raised numerous challenges to the merits of LCDC's order. Relying on our opinion in *Utsey v. Coos County*, 176 Or App 524, 32 P3d 933 (2001), *rev dismissed*, 335 Or 217 (2003), we dismissed 1000 Friends' petition for review for lack of standing, because 1000 Friends had not asserted that it or its members had suffered or will suffer a practical effect as a result of LCDC's order. *Polk County v. DLCD*, 199 Or App at 507. 1000 Friends petitioned for review in the Supreme Court.

While that petition was pending, the Supreme Court concluded in *Kellas* that we had erred in *Utsey*, holding that the source of law that determines standing to seek judicial review of a governmental action is the statute that confers standing in the particular proceeding that the party has initiated. According to the Supreme Court, standing is not a matter of common law but is, instead, conferred by the legislature. *Kellas*, 341 Or at 477. Meanwhile, in this case, the court vacated our former dismissal of the petition of 1000 Friends and remanded the case to us for reconsideration in light of *Kellas*.

## II. ANALYSIS

A. *Standing*

■ Under ORS 197.650, an order of LCDC may be appealed to the Court of Appeals in the manner provided in ORS 183.482 by persons who petitioned LCDC for an order or submitted comments, objections, or testimony in the context of a hearing on a petition. On remand, we conclude that, in

light of the court's decision in *Kellas*, 1000 Friends has standing under ORS 197.650 to assert its assignments of error on judicial review. We therefore turn to a consideration of 1000 Friends' assignments of error on the merits. We review LCDC's order for errors of law and for substantial evidence in the whole record. ORS 197.650; ORS 183.482(8)(c); *City of West Linn v. LCDC*, 201 Or App 419, 426, 119 P3d 285 (2005).

B. *Assignments of Error*

1. *Overview*

1000 Friends' assignments of error relate to the merits of LCDC's order approving in part and remanding in part the county's amendments. In general, the county's amendments added territories to the unincorporated community boundaries and adopted new comprehensive plan and zoning provisions for lands within those boundaries. The amendments also sought to define Grand Ronde as an "urban unincorporated community." Prior to the amendments, the communities of Grand Ronde, Fort Hill, and Valley Junction were each designated in the county's acknowledged comprehensive plan as "rural service centers," encompassing 149 acres, 87.5 acres, and 29.59 acres, respectively. Grand Ronde and Fort Hill were zoned for a mix of rural residential, commercial, and industrial use, and Valley Junction was zoned entirely rural commercial.

The new unincorporated community boundaries included 211 acres of land held in trust by the federal government on behalf of the Confederated Tribes of the Grand Ronde (trust land), and 184 acres of privately owned land (consisting of 15 individual ownerships) previously zoned Exclusive Farm Use (EFU) or Farm/Forest.

The county proposed designating Grand Ronde as an "urban unincorporated community" under OAR 660-022-0010(9), increasing its size to 1,086 acres, including 444 acres in Yamhill County. Because Yamhill County withdrew from the RPS, the acres within Yamhill County are not within the proposed boundary, and the proposed Grand Ronde "urban unincorporated community" boundary encompasses 642 acres. Of those acres, 292 acres are zoned EFU, including 123 acres held in trust. The remaining additional acreage is

within previously acknowledged exceptions to Goals 3 or 4 already zoned for rural residential, commercial, and industrial uses, but not previously included in the rural service center boundary in the county's acknowledged comprehensive plan.

The county proposed to increase the rural service center boundary of Valley Junction from 29.59 acres to an unincorporated community boundary of 139 acres, including 102.88 acres zoned EFU, of which 87.06 acres are held in trust, maintaining the rural service center designation. A remaining additional 7 acres are exception lands, which had not previously been included in the Valley Junction rural service center boundary in the county's acknowledged comprehensive plan. The county proposed a plan designation of UC Commercial for the entire Valley Junction boundary.

The county proposed maintaining Fort Hill as a rural service center under OAR 660-022-0010(8), encompassing 246 acres. That includes the addition of approximately 159 acres of exception lands that were not previously included in the Fort Hill rural service center boundary in the county's acknowledged comprehensive plan.

The county's plan amendment rezoned 61 acres north of Highway 22 along Jahn Road from EFU to Rural Residential (AR-5) and 3 acres on the west end of Grand Ronde from General Commercial (CG) to Rural Commercial (RC). Both of those areas are located just outside the community boundary for Grand Ronde.

The county also created two overlay zones to address water, sewer, and transportation capacity issues at Grand Ronde, to assure that future residential densities do not exceed the capacity of the transportation, sewer, and water systems. The overlay zones may be removed, permitting more intense development, upon completion of public facility plans and when the necessary facilities are available "to serve the specific unincorporated community."

LCDC approved some of the county's revisions, including the addition to the unincorporated communities of previously excepted areas already zoned for residential, commercial, and industrial uses, and approximately 211 acres of

trust land zoned as EFU in the county's previously acknowledged comprehensive plan.[2] The order also approved the county's application of AR-5 zoning to 18.67 acres of trust land located on Jahn Road.

In light of LCDC's determination that RPS was not applicable, LCDC determined that Goal 3 exceptions were necessary for the inclusion of EFU land in the unincorporated community boundaries. LCDC remanded the county's decision as to 226.56 privately owned acres zoned EFU or Farm/Forest for the taking of exceptions under Goal 3. LCDC's remand required the county to either remove those areas from the community boundaries or justify Goal 3 exceptions. The remand applied to two areas: (1) approximately 169 acres of resource-zoned land included in the Grand Ronde unincorporated community boundary; and (2) 15.31 acres of resource zoned land included in the Valley Junction rural service center boundary. The remand also required the county to justify a Goal 3 exception for 42.33 acres rezoned to AR-5 located along Jahn Road.

LCDC's order further required the county to (1) provide documentation that Grand Ronde qualifies as an urban unincorporated community (based on development located within an unincorporated community boundary that has been justified consistent with the Unincorporated Community Rule (OAR 660-022-0010(9)), or designate Grand Ronde as a rural community; (2) amend the Limited Use Overlay Zone A to state that, before its removal, necessary sewer and water facilities must be available "for that development"; (3) provide findings that rezoning of land for more intensive development resulting from application of the unincorporated community rules, including new exceptions, does not constitute a "new" conflicting use that may potentially affect significant Goal 5 resources that are already designated in the acknowledged comprehensive plan; (4) provide findings to justify industrial and commercial uses exceeding the

---

[2] The order approved the plan designation to UC Residential, UC Commercial, and UC Industrial of 123.35 acres of trust land within the unincorporated community boundary of Grand Ronde. It approved the plan designation of UC Commercial zoning as to 87 acres of trust land within the adopted unincorporated community boundary of Valley Junction.

small-scale, low-impact standards under OAR 660-022-0030(3) and (4); and (5) amend the zoning provisions to limit hotels and motels in Grand Ronde to 35 units as required by OAR 660-022-0050(5)(b).

LCDC exempted EFU-zoned trust lands from the remand order. LCDC explained that the location and extent of existing and planned development on the trust lands supported the county's decision to include those acres within the unincorporated community boundaries. LCDC's order explained that the approved sections of the county's submittal were not affected by the remaining portion of the submittal that was remanded. OAR 660-025-0150(1)(d).

In its first assignment of error, 1000 Friends contends that in approving unincorporated community boundaries for Grand Ronde, Valley Junction, and Fort Hill, LCDC improperly disregarded the criteria of the Unincorporated Communities Rules, OAR 660-022-0010 to 660-022-0070, and that LCDC's decision is not supported by substantial evidence. In its second assignment, 1000 Friends contends that the county's submittal allows uses that are inconsistent with the identified function, capacity, and level of service of transportation facilities serving the communities and thereby fails to comply with OAR 660-022-0030(7). In its third assignment, 1000 Friends contends that the residential zoning applied to the three communities is inconsistent with the adopted population projection for the area, and therefore violates Goal 2, Part I, and ORS 195.025 and ORS 195.036. In its fourth assignment, 1000 Friends asserts that the decision to approve rezoning of land along Jahn Road from EFU to rural residential does not comply with OAR chapter 660, division 004, and that LCDC has acted outside the permitted range of its discretion, contrary to ORS 183.482(8)(b)(A).

Underlying the dispute concerning the boundaries of the unincorporated communities is a disagreement about whether the county's submitted amendments *expand* existing unincorporated community boundaries or *establish new* boundaries. The boundary of an existing unincorporated

community may be "expanded," OAR 660-004-0022,[3] but any expansion including uses not allowed by the applicable goals must include a Goal 2, Part II(c), exception based on a "demonstrated need," as described in OAR 660-004-0022. If the county's amendments are an expansion of boundaries, then the county is required under the Unincorporated Communities Rules to demonstrate a need for the expansion. If the amendments are the initial establishment of boundaries, then, as LCDC concluded, the rules regarding demonstrated need for expansion do not restrict the county's proposed boundaries, or zoning within the unincorporated communities, as long as the criteria of OAR 660-022-0020 are met.

---

[3] OAR 660-004-0022 provides, in part:

"(4) Expansion of Unincorporated Communities: For the expansion of an Unincorporated Community defined under OAR 660-022-0010(10), appropriate reasons and facts include but are not limited to the following:

"(a) A demonstrated need for additional land in the community to accommodate a specific rural use based on Goals 3-19 and a demonstration that either:

"(A) The use requires a location near a resource located on rural land; or

"(B) The use has special features necessitating its location in an expanded area of an existing unincorporated community, including:

"(i) For industrial use, it would have a significant comparative advantage due to its location (i.e., near a rural energy facility, or near products available from other activities only in the surrounding area; or it is reliant on an existing work force in an existing unincorporated community);

"(ii) For residential use, the additional land is necessary to satisfy the need for additional housing in the community generated by existing industrial, commercial, or other economic activity in the surrounding area. The plan must include an economic analysis showing why the type and density of planned housing cannot be accommodated in an existing exception area or UGB, and is most appropriate at the particular proposed location. The reasons cannot be based on market demand for housing, nor on a projected continuation of past rural population distributions.

"(b) Need must be coordinated and consistent with the comprehensive plan for other exception areas, unincorporated communities, and UGBs in the area. Area encompasses those communities, exception areas, and UGBs which may be affected by an expansion of a community boundary, taking into account market, economic, and other relevant factors;

"(c) Expansion requires demonstrated ability to serve both the expanded area and any remaining infill development potential in the community at time of development with the level of facilities determined to be appropriate for the existing unincorporated community.

"(5) Expansion of Urban Unincorporated Communities: Expansion of an urban unincorporated community defined under OAR 660-022-0010(9) shall comply with OAR 660-022-0040."

In concluding that the boundaries are newly established, rather than expanded, LCDC reasoned that, although the communities had been designated as rural service centers in the county's previously acknowledged comprehensive plan, that plan predated the adoption of the Unincorporated Communities Rules, and the proposed changes therefore involve an initial application of the Unincorporated Communities Rules to the unincorporated communities; accordingly, the drawing of the boundaries is the "establishment" of community boundaries under those rules.

LCDC's interpretation of its own rule is entitled to deference if it is within the range of its responsibility for effectuating a broadly stated statutory policy and is not inconsistent with the text of the rule or with any other source of law. *Dunning v. Corrections Facility Siting Authority*, 325 Or 269, 277 n 4, 935 P2d 1209 (1997) ("We apply [the] deferential standard only when the body interpreting the rule is also the body that promulgated it."); *Johnson v. Employment Dept.*, 187 Or App 441, 447, 67 P3d 984 (2003). We conclude that LCDC's decision to treat boundaries drawn in a jurisdiction's initial application of the Unincorporated Communities Rules as the *establishment*, rather than the expansion, of community boundaries, is consistent with the text of the rules and not inconsistent with any statute. Further, we agree with LCDC that the Unincorporated Communities Rules do not limit the size of the initially established boundaries of an unincorporated community or the residential zoning within the unincorporated community. *See* OAR 660-022-0030(2) ("[C]ounty plans and land use regulations may authorize any residential use and density in unincorporated communities, subject to the requirements of this division."). With that preliminary conclusion as backdrop, we consider each of the assignments in turn.

### 2. *First Assignment*

1000 Friends' first assignment challenges LCDC's approval of new boundaries for the rural service centers of Grand Ronde, Valley Junction, and Fort Hill, including land that it considers to be ineligible for inclusion under the rules relating to boundaries for unincorporated communities. The Unincorporated Communities Rules define four types of

unincorporated communities: resort communities, rural communities, rural service centers, and urban unincorporated communities. OAR 660-022-0010(6) - (9).[4] To fall within the Unincorporated Communities Rules, an unincorporated

---

[4] OAR 660-022-0010 defines unincorporated communities:

"For purposes of this division, the definitions contained in ORS 197.015 and the statewide planning goals (OAR Chapter 660, Division 15) apply. In addition, the following definitions apply:

"* * * * *

"(6) 'Resort Community' is an unincorporated community that was established primarily for and continues to be used primarily for recreation or resort purposes: and

"(a) Includes residential and commercial uses; and

"(b) Provides for both temporary and permanent residential occupancy, including overnight lodging and accommodations.

"(7) 'Rural Community' is an unincorporated community which consists primarily of permanent residential dwellings but also has at least two other land uses that provide commercial, industrial, or public uses (including but not limited to schools, churches, grange halls, post offices) to the community, the surrounding rural area, or to persons traveling through the area.

"(8) 'Rural Service Center' is an unincorporated community consisting primarily of commercial or industrial uses providing goods and services to the surrounding rural area or to persons traveling through the area, but which also includes some permanent residential dwellings.

"(9) 'Urban Unincorporated Community' is an unincorporated community which has the following characteristics:

"(a) Includes at least 150 permanent residential dwellings units;

"(b) Contains a mixture of land uses, including three or more public, commercial or industrial land uses;

"(c) Includes areas served by a community sewer system; and

"(d) Includes areas served by a community water system.

"(10) 'Unincorporated Community' means a settlement with all of the following characteristics:

"(a) It is made up primarily of lands subject to an exception to Statewide Planning Goal 3, Goal 4 or both;

"(b) It was either identified in a county's acknowledged comprehensive plan as a 'rural community', 'service center', 'rural center', 'resort community', or similar term before this division was adopted (October 28, 1994), or it is listed in the Department of Land Conservation and Development's January 30, 1997 'Survey of Oregon's Unincorporated Communities';

"(c) It lies outside the urban growth boundary of any city;

"(d) It is not incorporated as a city; and

"(e) It met the definition of one of the four types of unincorporated communities in sections (6) through (9) of this rule, and included the uses described in those definitions, prior to the adoption of this division (October 28, 1994)."

community had to be designated as a community in a county comprehensive land use plan as of October 28, 1994. As of October 28, 1994, each of the unincorporated communities involved in Work Task 3 had been designated as a "rural service center" on the county's comprehensive plan.

The requirements for the establishment of boundaries of an unincorporated community are set forth in OAR 660-022-0020, which provides, in part:

"(1)  Except as provided in OAR 660-022-0070, county comprehensive plans shall designate and identify unincorporated communities in accordance with the definitions in OAR 660-022-0010. Counties may amend these designations as circumstances change over time.

"(2)  Counties shall establish boundaries of unincorporated communities in order to distinguish lands within the community from exception areas, resource lands and other rural lands. The boundaries of unincorporated communities shall be shown on the county comprehensive plan map at a scale sufficient to determine accurately which properties are included.

"(3)  Only land meeting the following criteria may be included within an unincorporated community boundary:

"(a)  Land which has been acknowledged as a Goal 3 or 4 exception area and historically considered to be part of the community provided the land only includes existing, contiguous concentrations of:

"(A)  Commercial, industrial, or public uses; and/or

"(B)  Dwelling units and associated residential lots at a greater density than exception lands outside rural communities.

"(b)  Land planned and zoned for farm or forest use provided such land meets the criteria in section (4) of this rule.

"(4)  Community boundaries may include land that is designated for farm or forest use pursuant to Goals 3 and 4 if all the following criteria is met:

"(a)  The land is contiguous to Goal 3 or 4 exception lands included in the community boundary;

"(b)   The land was occupied on the date of this division (October 28, 1994) by one or more of the following uses considered to be part of the community: Church, cemetery, school, park, playground, community center, fire station, museum, golf course, or utility facility;

"(c)   Only the portion of the lot or parcel that is occupied by the use(s) in subsection (b) of this section is included within the boundary; and

"(d)   The land remains planned and zoned under Goals 3 or 4."

The focus of 1000 Friends' first assignment is on the county's failure to explain how the boundaries for each of the unincorporated communities satisfy the requirements of OAR 660-022-0010 and OAR 660-022-0020, focusing specifically on the inclusion within the boundaries of (1) trust lands for which no exception has been sought; (2) EFU acres that have been remanded for Goal 3 exceptions; and (3) other previously excepted EFU acreage not discussed in the order. 1000 Friends contends that the commission's order contains no findings showing that the inclusion of those lands within the unincorporated communities boundaries is consistent with the requirements of OAR 660-022-0010 and OAR 660-022-0020, specifically because the order lacks findings that the communities (1) are made up primarily of lands subject to an exception to Goal 3 or 4 or both (OAR 660-022-0010(1)(a)); (2) include only lands acknowledged as Goal 3 or 4 exception areas (OAR 660-022-0020(3)(a)); (3) include only lands historically considered to be a part of the community (OAR 660-022-0020(3)(a)(A), (B)); (4) include only existing contiguous concentrations of commercial, industrial, or public uses and/or dwelling units and associated residential lots at a greater density than exception lands outside rural communities (OAR 660-022-0020(4)); and (5) include within the boundary only farm or forest land contiguous to land for which an exception has been taken and was occupied by a use considered to be part of the community (such as a school or church), and then only the portion of the land so occupied (OAR 660-022-0020(4)).

As we have noted, LCDC remanded the county's amendments relating to the nontrust EFU acres for the taking of Goal 3 exceptions. That remand is unchallenged, and to

the extent that 1000 Friends' assignment of error relates to that acreage, we do not address it, because it is unknown whether and to what extent those areas will be included in the unincorporated communities' boundaries after the county's resolution of the remand. LCDC concluded, however, that even with those lands excluded from the boundaries, Grand Ronde, Valley Junction, and Fort Hill qualify as unincorporated communities based on inventory information compiled by the county as part of the RPS. LCDC approved the unincorporated communities' boundaries as to the remaining acres, including previously excepted privately owned EFU land[5] and trust land of the Confederated Tribes of the Grand Ronde.

■　We address first 1000 Friends' contention that trust lands that the county had previously zoned for farm use could not be included in the unincorporated communities' boundaries in the absence of Goal 3 exceptions and should have been remanded. The parties agree that the county has no authority to zone trust lands. *See, e.g., McClanahan v. Arizona State Tax Comm'n.*, 411 US 164, 170-71, 93 S Ct 1257, 36 L Ed 2d 129 (1973) (except where Congress has expressly provided, state laws generally are not applicable to Indian people or Indian lands); *Gobin v. Snohomish County*, 304 F3d 909, 916 (9th Cir 2002), *cert den*, 538 US 908 (2003) (Indian land held in trust not subject to zoning laws); *City of Lincoln City v. U.S. Dept. of Interior*, 229 F Supp 2d 1109 (D Or 2002) (a state's authority over the land within its boundaries is subject to the sovereignty of an Indian tribe over its lands). Nonetheless, the county's previously acknowledged comprehensive plan established EFU and Farm/Forest zoning for the trust lands sought to be included within the unincorporated community boundaries.

OAR 660-022-0010(1) provides that an unincorporated community is a settlement "made up primarily of lands subject to an exception to Statewide Planning Goal 3, Goal 4 or both." OAR 660-022-0020(3) provides that an unincorporated community boundary may include only land that has

---

[5] LCDC's order explains that the new boundaries include "[e]xisting acknowledged exceptions already zoned for rural residential, commercial and industrial uses."

been "acknowledged as a Goal 3 or 4 exception area." 1000 Friends contends that, necessarily, trust lands that are zoned EFU or Farm/Forest may not be included in the absence of an exception. We take a different view. Because trust lands are not subject to the goals in the first place, necessarily, they are not subject to exceptions, *i.e.*, no exceptions need be taken.[6] Accordingly, we hold that LCDC correctly concluded that, with the tribe's agreement, trust lands could be included within the boundaries of the unincorporated communities without the taking of exceptions. LCDC further found that the trust lands were appropriate for inclusion within the unincorporated communities' boundaries because of their current development and the tribe's planned development of the land. We have reviewed the record and conclude that LCDC's findings are supported by substantial evidence.

■ Because the county's plan was developed within the RPS process, which allowed LCDC to waive strict compliance with the rules implementing the goals, the county did not develop its record around the objective of establishing full compliance with the requirements of OAR 660-022-0020. 1000 Friends asserts that the county has failed to support with findings its inclusion in the unincorporated communities' boundaries of previously excepted EFU land. LCDC did not expressly address that land, other than by a passing reference to it as land previously excepted. LCDC found, however, that the proposed boundaries satisfied the requirements of OAR 660-022-0020(3). We have reviewed the record and conclude that substantial evidence supports LCDC's findings that the proposed boundaries including the previously excepted land satisfy the requirements of the administrative rule.

### 3. *Second Assignment*

■ In its second assignment of error, 1000 Friends contends that the county's plan fails to comply with the transportation planning rule, OAR 660-012-0060, because the plan allows development and uses that are inconsistent with

---

[6] OAR 660-033-0020(6) provides that " 'Exception Area' means an area no longer subject to the requirements of Goal 3 or 4 because the area is the subject of a site specific exception acknowledged pursuant to ORS 197.732 and OAR chapter 660, division 4."

the current capacity and level of highway facilities serving the communities. OAR 660-022-0030(7) provides:

> "County plans and land use regulations shall allow only those uses which are consistent with the identified function, capacity and level of service of transportation facilities serving the community, pursuant to OAR 660-012-0060(1)(a) through (c)."

At the time LCDC issued its order, OAR 660-012-0060(1) (1999) provided, in part:

> "Amendments to functional plans, acknowledged comprehensive plans, and land use regulations which significantly affect a transportation facility shall assure that allowed land uses are consistent with the identified function, capacity, and performance standards (e.g. level of service, volume to capacity ratio, etc.) of the facility. This shall be accomplished by * * *
>
> "(a) Limiting allowed land uses to be consistent with the planned function, capacity, and performance standards of the transportation facility[.]"

LCDC defends its approval of the plan by explaining that the county's limited use overlay zone complies with *former* OAR 660-012-0060(1)(a) by preventing new development until either the actual construction of highway facilities or the adoption of a plan to provide capacity. 1000 Friends counters that an overlay zone that permits development when a plan is in place but before the services are developed does not comply with the requirement of OAR 660-022-0030(7) that a county's plan "shall allow only those uses which are consistent with the identified function, capacity and level of service of transportation serving the community."

In *Jaqua v. City of Springfield*, 193 Or App 573, 91 P3d 817 (2004), we considered a contention similar to 1000 Friends' under the same version of OAR 660-012-0060 that was in effect at the time of LCDC's order in this case. In that case, the development of a hospital facility contemplated by an ordinance of the City of Springfield was expected to affect over 50 state and local transportation facilities, with one anticipated failure during the planning period. To address that anticipated failure, the city imposed a condition that the property owner immediately provide funding needed to

improve the facility likely to fail. The petitioners contended that if a failure of transportation services occurred even temporarily during the planning period, the City was required to apply one or more of the mitigating measures, which at the time were set out in OAR 660-012-0060(1), until the failure was corrected by the construction of improvements. 193 Or App at 592. LUBA concluded that OAR 660-012-0060 serves to prevent local governments from engaging in land use decision-making without considering whether transportation systems can accommodate the proposed use. The hospital and *amicus* League of Oregon Cities contended that LUBA's analysis would require that transportation facilities be constructed concurrently with new developments rather than be completed at the end of the planning period, resulting in "piece-meal decision-making" and

> "the construction of projects that provide fewer benefits to the transportation system as a whole prior to more beneficial projects, thereby preventing the governmental entities from carrying out those transportation improvements in the most cost effective and efficient manner."

193 Or App at 593. We rejected the contention that LUBA's decision necessarily contemplated concurrent construction of transportation and development. We agreed with LUBA's conclusion, however, that an interim failure of an affected facility is a significant "effect" on a transportation facility under OAR 660-012-0060(2) that, if anticipated, required consideration of the mitigation measures set out in the rule then provided at subsection (1). We said, further:

> "*Our understanding (and LUBA's) does not mean that the rule necessarily requires that, before an approved change in land use occurs, road improvements must occur.* The rule offers alternatives to the local land use planning body. However, importantly, the rule does not authorize any delay in implementing the mitigating factors in subsection (1) until the end of the planning period once it is determined that a land use regulation significantly affects a transportation facility. The rule means what it says. Subsection (2) of the rule identifies certain criteria for determining whether a land use regulation 'significantly affects a transportation facility,' and if one of those criteria exists, subsection (1) is explicity about what must occur. If we were to

write the qualification into the rule that the city, [the hospital] and *amicus* propose, we would be undertaking a legislative function to add terms to the rule that simply are not expressed in it."

193 Or App at 594 (emphasis added). We held that the transportation planning rule required the implementation of mitigating measures until the failure in a transportation facility is corrected.

In this case, unlike in *Jaqua*, the county has provided a mitigating measure for the anticipated inadequacy of the transportation services. The overlay zone proposed by the county prevents development that would allow a use of the highway beyond its current planned capacity, and requires that increased development not take place until a new highway plan is in place to meet the new development needs.[7] As we said in *Jacqua*, contrary to 1000 Friends' contention, the rule does not require that the permitted land uses be consistent with the transportation infrastructure currently provided, only that mitigating measures be in place.

### 4. *Third Assignment*

■ In its third assignment of error, 1000 Friends contends that LCDC erred in its approval of residential zoning for lands within the three unincorporated communities. 1000 Friends asserts that the zoning permits residential

---

[7] We note that since our decision in *Jaqua*, and since its own order in this case, LCDC has amended OAR 660-012-0060. The rule now provides:

"(1) Where an amendment to a functional plan, an acknowledged comprehensive plan, or a land use regulation would significantly affect an existing or planned transportation facility, the local government shall put in place measures as provided in section (2) of this rule to assure that allowed land uses are consistent with the identified function, capacity, and performance standards (e.g. level of service, volume to capacity ratio, etc.) of the facility. * * *

"(2) Where a local government determines that there would be a significant effect, compliance with section (1) shall be accomplished through one or a combination of the following:

"(a) Adopting measures that demonstrate allowed land uses are consistent with the *planned* function, capacity, and performance standards of the transportation facility."

The new rule unambiguously provides that an amendment that would have significant impact on an existing or planned transportation facility be consistent with the "planned" capacity of the transportation facility. That version of the rule would be applicable if we were to remand this issue to the county.

development in excess of adopted population projections for the area and therefore violates Goal 2, Part I and ORS 195.025 and ORS 195.036. Contrary to 1000 Friends' contention, the county's zoning within an unincorporated community is not restricted by population projections. OAR 660-022-0030(2) provides that "county plans and land use regulations may authorize any residential use and density in unincorporated communities, subject to the requirements of this division." ORS 195.025 and ORS 195.036 are not to the contrary. ORS 195.025 requires the county to act as the coordinating body for all land use activities within its boundaries. ORS 195.036 requires the county to establish and maintain a population forecast for use in updating its comprehensive plan. There is no inconsistency between those provisions and OAR 660-022-0030(2).

5. *Fourth Assignment*

In its fourth and final assignment of error, 1000 Friends asserts that LCDC's approval of the county's designation of 18.67 acres of trust land along Jahn Road from EFU to rural residential must be remanded for the taking of an exception. As explained in our discussion of the first assignment of error, the county has no authority to zone trust land, and the land is not subject to the goals. Accordingly, the county's zoning of those acres does not require the taking of an exception.

Affirmed.