302 May 1, 2024 No. 278

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

CENTRAL OREGON LANDWATCH,
*Respondent,*

*v.*

JEFFERSON COUNTY,
*Respondent,*
*and*

MAC INVESTMENTS, INC.,
*Petitioner.*

Land Use Board of Appeals
2023026; A182390 (Control)

CENTRAL OREGON LANDWATCH,
*Respondent,*

*v.*

JEFFERSON COUNTY,
*Petitioner,*
*and*

MAC INVESTMENTS, INC.,
*Respondent.*

Land Use Board of Appeals
2023026; A182391

Argued and submitted November 16, 2023.

D. Adam Smith argued the cause for petitioners. Also on the brief were Bailey M. Oswald and Schwabe Williamson & Wyatt P.C.; and Rand Campbell and Rand Campbell Law LLC.

Rory Isbell argued the cause for respondent. Also on the brief was Central Oregon LandWatch.

Before Tookey, Presiding Judge, Lagesen, Chief Judge, and Kamins, Judge.

LAGESEN, C. J.

Reversed and remanded as to the determination that the county must apply OAR 660-004-0020(4) and OAR 660-004-0022(4) to petitioner's application; otherwise affirmed.

**LAGESEN, C. J.**

Petitioner MAC Investments, Inc., petitions for judicial review a final order of the Land Use Board of Appeals (LUBA). In that order, LUBA remanded Jefferson County's decision approving petitioner's application for a comprehensive plan map amendment and zone change from Range Land to Rural Residential 2 acre. In approving petitioner's application, the county approved exceptions to Statewide Planning Goal 3, relating to agricultural lands, and Statewide Planning Goal 14, relating to urbanization.

LUBA remanded for two reasons. First, it remanded because it concluded that the county's findings of fact and statements of reasons justifying the exceptions were not adequate for review under *Sunnyside Neighborhood v. Clackamas Co. Comm.*, 280 Or 3, 21, 569 P2d 1063 (1977), and other case law from both this court and LUBA. Second, it remanded because it determined that petitioner's project would result in what LUBA described as a "*de facto*" expansion of the Crooked River Ranch rural unincorporated community, so as to require the county to apply the criteria that apply under OAR 660-004-0020(4) and OAR 660-004-0022(4). For the reasons that follow, we reverse and remand LUBA's decision insofar as it concluded that the county was required to assess whether petitioner's proposal satisfied the prerequisites of OAR 660-004-0020(4) and OAR 660-004-0022(4) as a condition to approving petitioner's application. We otherwise affirm.

The relevant facts are not in dispute. We draw them in the main from LUBA's order and the procedural record.

Crooked River Ranch is a designated rural unincorporated community in the Jefferson County Comprehensive plan. *See* OAR 660-022-0020(1) ("Except as provided in OAR 660-022-0070, county comprehensive plans shall designate and identify unincorporated communities in accordance with the definitions in OAR 660-022-0010."). As the map below reflects, a topologist might describe the shape of the Crooked River Ranch rural unincorporated community as a highly irregular figure eight. It appears to have one,

very bumpy, continuous exterior boundary, and two interior boundaries: one a rectangle, one a square.



The rectangular boundary defines the property at issue in this case, a 142.5-acre parcel that is undeveloped and designated as Range Land in the Jefferson County Comprehensive Plan. LUBA's order explains that the land was excluded from the community because, at the time the community was platted, the land was owned by the United States Forest Service. In 1989, a private party obtained the land from the federal government, with the goal of developing it as part of the Crooked River Ranch.

The current application stems from petitioner's desire to create a residential development on that property. Because the property is designated as Range Land in the county's comprehensive plan, to accomplish its objective petitioner submitted an application for a comprehensive plan amendment and zone change to change the designation of the land from Range Land to Rural Residential 2 acre. Petitioner did not request, however, that the county add the

parcel to the land designated as the Crooked River Ranch rural unincorporated community, or otherwise amend the comprehensive plan to change the boundaries of the unincorporated community so as to include petitioner's property. Instead, petitioner requested that the county approve exceptions to Goal 3, which aims "to preserve and maintain agricultural lands *** for farm use," OAR 660-033-0010, and Goal 14, which aims "[t]o provide for an orderly and efficient transition from rural to urban land use." *1000 Friends v. LCDC*, 292 Or 735, 739, 642 P2d 1158 (1982). The county planning commission recommended denial of the application on the ground that there was insufficient evidence that the proposal satisfied Part 5 of the Jefferson County Comprehensive Plan (JCCP), which provides, in part, that a proposed zone change or map amendment "[b]e necessary due to changes in physical, economic or social conditions, population growth, or development patterns which require an adjustment in the land use designations where the amendment is proposed."

The county board of commissioners, however, ultimately voted to approve the application. Addressing the JCCP Part 5 issue, the board of commissioners found that "[t]he record in this matter is replete with evidence provided by both the Applicant and County staff demonstrating that the surrounding Crooked River Ranch ("CRR") community has experienced tremendous population growth and a shifting development pattern which has functionally isolated the Subject Parcel from any other neighboring agriculture activity." The board of commissioners further approved the exceptions to Goal 3 and Goal 14 necessary to permit the conversion of Range Land to residential land. Although, in the commissioners' view, petitioner's proposal was for a rural use, thus allowing for a Goal 14 "reasons" exception under OAR 660-004-0020, the Department of Land Conservation and Development (DLCD) advised that the proposal's request for 2-acre lots was a request for an urban use, requiring the application of OAR 660-014-0030 or ORS 660-014-0040 for any Goal 14 exception. As a result, the board of commissioners approved as alternatives a "reasons" exception

under OAR 660-004-0020[1] and an "irrevocably committed" exception under OAR 660-014-0030.[2]

Respondent Central Oregon LandWatch appealed to LUBA. Pertinent to the issues presented to us, LandWatch argued that the county's findings and statements of reasons, as a whole, were not adequate for review. In response, petitioner and the county argued, among other things, that the county's findings were adequate and that, in all events, LandWatch waived its ability to challenge the county's findings approving an irrevocably committed exception to Goal 14 under OAR 660-014-0030.

LandWatch also argued that the county's decision "impermissibly adopts an expansion of an unincorporated community, as defined at OAR 660-022-0010(10), but fails to apply the applicable criteria at OAR 660-004-0020(4) and OAR 660-004-0022(4)." In support of that argument, LandWatch pointed to the fact that the public notice for the planning commission's first meeting on the application, as well as some other documentation, characterized the proposal as one to amend the comprehensive plan to expand the Crooked River Ranch rural community by 142 acres. LandWatch further argued that, if the application was not for an expansion of an unincorporated community, then the application had been materially altered and LandWatch had been prejudiced by the county's failure to give notice of that alteration.

In response to LandWatch's argument that petitioner's application had requested that the county expand the unincorporated community within the meaning of OAR

---

[1] A "reasons" exception applies when a local government "determines there are reasons *** to use resource lands for uses not allowed by the Goal." OAR 660-004-0020(1). The local government must "set forth the facts and assumptions used as the basis for determining that a state policy embodied in a goal should not apply to specific properties or situations." *Id*. at (2)(a). OAR 660-004-0022(2) sets for additional requirements for governments to comply with when taking a "reasons" exception for rural residential development.

[2] An "irrevocably committed" exception applies when a local government determines "that rural land is irrevocably committed to urban levels of development." OAR 660-014-0030(1). The rule provides further requirements that a local government must comply with to take the exception. If the local government satisfies those requirements, then it is not required "to apply Goal 14's requirement prohibiting the establishment of urban uses on rural lands." *Id*.

660-004-0020(4), the county and petitioner pointed out that the planning commission had later corrected that erroneous description of the application, and that the commission's staff had informed the public at a subsequent meeting that the application did not propose to expand the geographical boundaries of the Crooked River Ranch unincorporated rural community. The county and petitioner also argued that LandWatch's assertion that its substantial rights had been prejudiced by the "alteration" of the application failed because the application had not, in fact, been altered.

As noted, LUBA agreed with LandWatch's argument that the county's findings of facts and statements of reason were inadequate for review. In so doing, it did not address the argument that LandWatch waived its ability to challenge the findings and statement of reasons pertaining to the irrevocably committed exception to Goal 14. LUBA also determined that the approval of the application would result in a "*de facto* expansion" of the Crooked River Ranch unincorporated rural community and, for that reason, had to comply with criteria that apply when a county seeks to designate additional lands as part of an unincorporated rural community, namely OAR 660-004-0020(4) and OAR 660-004-0022(4). Based on those two determinations, LUBA remanded to the county.

Petitioner and the county petitioned for judicial review. They raise three assignments of error. In the first assignment of error, they contend that LUBA erred when it did not address their argument that LandWatch waived its ability to challenge the findings related to the Goal 14 irrevocably committed exception by not raising the issue before the county. In the second assignment of error, they contend that LUBA erred when it determined that the county was required to evaluate petitioner's application under the criteria that apply to a decision under OAR 660-004-0020(4) to "expand" an unincorporated rural community. In their third assignment of error, they assert that LUBA erred to the extent that it determined that the county's findings and statement of reasons with respect to the Goal 14 irrevocably committed exception were inadequate for review. LandWatch responds that petitioner and the county failed

to preserve the first and third assignments of error. With respect to the second, LandWatch asserts that LUBA correctly concluded that the approval of petitioner's application would result in an expansion of the Crooked River Ranch rural unincorporated community for purposes of OAR 660-004-0022.

We review LUBA's order to determine if it is "unlawful in substance or procedure," ORS 197.850(9)(a). Applying that standard, we conclude that the first and third assignments of error identify no error in LUBA's decision. We conclude otherwise with respect to the second assignment of error. Because the approval of petitioner's application did not expand the boundaries of the Crooked River Ranch rural unincorporated community, the county was not required to apply the criteria contained in OAR 660-004-0020(4) or OAR 660-004-0022(4) when deciding whether to approve petitioner's application.

We start with the first and third assignments of error. Petitioner and the county point to the fact that the county determined that petitioner satisfied the criteria for both a reasons exception to Goal 14 and an irrevocably committed exception to Goal 14. Petitioner and the county further contend that LUBA should have upheld the county's approval of a Goal 14 exception, either on the ground that LandWatch waived the ability to challenge the approval of a Goal 14 irrevocably committed exception or, alternatively, on the ground that the county's findings of fact and statement of reasons for the irrevocably committed exception were adequate for review. In the view of petitioner and the county, LUBA therefore erred when it remanded the entirety of the case to the county based on LUBA's conclusion that the county's findings and statements of reasons were inadequate. Rather, according to petitioner and the county, LUBA should have sustained the county's approval of a Goal 14 irrevocably committed exception.

Setting aside LandWatch's preservation arguments (which are not without some merit), although the route petitioner and the county propose may well have been a permissible one for LUBA, we are not persuaded it was a required one. As LUBA concluded, the county's choice to incorporate

by reference facts and analysis from an expansive record—rather than articulating findings and reasoning directly—made it so a reasonable person would have great difficulty ascertaining what, exactly, the county's findings and reasoning were. Although portions of the record incorporated by reference may have contained cogent factual findings and reasoning—such as the portion articulating the basis for the county's determination that an irrevocably committed exception was warranted—many other portions of the record that the county incorporated by reference do not contain cogent findings and analysis. Having adequate findings and statements of reasons, including for any Goal 14 exception, will facilitate evaluation of the waiver argument advanced by petitioner and the county, and will also facilitate review of the county's decision to approve a Goal 14 exception. Given the overarching inadequacy of the county's findings and statements of reasons, we conclude that LUBA did not err as a matter of substance or procedure when it remanded the entire case to the county to supply adequate findings and statements of reasons.

As for the second assignment of error, we agree with petitioner and the county that LUBA erred when it concluded that the county was required to apply the criteria for determining whether to expand an unincorporated community. Simply put, those criteria do not apply where, as here, a proposal does not seek to have land added to a designated unincorporated rural community.

Understanding this conclusion requires some understanding of the land-use planning role played by the recognition of unincorporated communities. Before 1994, the land-use laws did not account for unincorporated communities. Edward J. Sullivan and Benjamin H. Clark, *A Timely, Orderly and Efficient Arrangement of Public Facilities and Services—The Oregon Approach*, 49 Willamette L Rev 411, 452-53 (2013). Because such land was located outside an urban growth boundary, this meant that, notwithstanding the existing character of the uses in such communities, the development of such land for "urban uses" required taking exceptions to Goal 14, if such uses did not comport with Goal 14. *1000 Friends of Oregon v. LCDC (Curry Co.)*, 301 Or

447, 470-71, 724 P2d 268 (1986) (conversion of land outside of an urban growth boundary to an urban use requires either compliance with Goal 14 or an exception to Goal 14).

In 1994, the land-use laws were revised to account for unincorporated communities and to create a less burdensome process for developing land contained within their boundaries that would not require use of the exception process:

> "Since 1994, Oregon has recognized the existence of unincorporated communities outside of cities and their urban growth boundaries. Goal 14 was revised in that year and provides for the continued existence and possible expansion of those communities outside urban growth boundaries. The goal allows counties to approve, on lands outside of urban growth boundaries, uses and public facilities and services that are more intensive than would be allowed by Goals 11 and 14. Counties may approve such uses either through the exceptions process or as provided by [the LCDC rules governing the planning and zoning of unincorporated communities, OAR chapter 660, division 22] ensuring that the more intensive uses have no adverse effect on agricultural or forest operations, nor interfere with the function of urban growth boundaries. This was a practical solution for a difficult problem pitting lawfully existing communities against a system that would not allow further expansion of those communities, thereby endangering their future. The rules allow for limited expansion and development that would not otherwise have been permitted under Goals 11 and 14, and allow those activities in accordance with the classification of the community (*e.g.*, resort, rural, rural center, urban)."

Sullivan and Clark, 49 Willamette L Rev at 452-53 (footnotes omitted); *see also* Dept. of Land Conservation & Dev., *A Citizens Guide to the Oregon Coastal Management Program*, 13-14 (July 2014) (providing an overview of rural land development in Oregon; explaining that such development is permitted in "unincorporated communities" and in "exception areas").

Thus, OAR chapter 660, division 22, was adopted to govern the planning and zoning of land within designated unincorporated communities in a way that did not always

require the use of the exception process. The purpose of the division is, as noted, to make it easier to allow some urban uses within those communities by eliminating the need to go through the exceptions process:

> "The purpose of this division is to establish a statewide policy for the planning and zoning of unincorporated communities that recognizes the importance of communities in rural Oregon. It is intended to expedite the planning process for counties by reducing their need to take exceptions to statewide planning goals when planning and zoning unincorporated communities."

OAR 660-022-0000(1). To accomplish that purpose, OAR 660-022-0020 has required that "county comprehensive plans shall designate and identify unincorporated communities in accordance with the definitions in OAR 660-022-010" since 1994. OAR 660-022-0020(1). Designating an unincorporated community requires counties to "establish boundaries of unincorporated communities" and to show "[t]he boundaries of unincorporated communities * * * on the county comprehensive plan map at a scale sufficient to determine accurately which properties are included." OAR 660-022-0020(2). "Only land meeting [specified] criteria may be included within an unincorporated community boundary[.]" OAR 660-022-0020(3). The rules permit—but do not require—counties to amend their designations of unincorporated communities to account for changing circumstances: "Counties may amend these designations [of unincorporated communities] as the circumstances change over time." OAR 660-022-0020(1).

A county may also approve the "expansion" of an existing unincorporated community. OAR 660-004-0020(4); OAR 660-004-0022(4). Although the rules do not expressly define what constitutes an "expansion" of an unincorporated community that has been designated in a comprehensive plan, we previously have viewed the expansion of an unincorporated community to be an expansion of its boundary. Specifically, citing OAR 660-004-0022(4), we previously have explained that "[t]he boundary of an existing unincorporated community may be 'expanded,' OAR 660-004-0022, but any expansion including uses not allowed by the applicable goals must include a Goal 2, Part II(c) exception based on

a 'demonstrated need,' as described in OAR 660-004-0022."
*Polk County v. DLCD*, 217 Or App 521, 530-31, 176 P3d 432,
*rev den*, 345 Or 317 (2008) (footnote omitted).

With that background about the land-use planning
function of designating the boundaries of unincorporated
communities in county comprehensive plans in mind, we
turn to the parties' arguments. Petitioner and the county
argue that the county was not required to apply the criteria
applicable to an expansion of an unincorporated community
because, although petitioner intends for its development to
be part of the existing Crooked River Ranch community, in
the sense that the proposed development will, in practical
effect, create a new residential development within the inte-
rior of the existing community, petitioner never requested
that the comprehensive plan be amended to include its land
as part of the unincorporated community for the purpose of
obtaining the land-use planning benefits of that designa-
tion. Rather, petitioner simply requested a comprehensive
plan and zone change, along with the necessary exceptions
to Goal 3 and 14, that would allow petitioner to use the land
in the way that it proposes.[3] Petitioner and the county assert
that, because it did not seek to have the boundaries of the
unincorporated community changed, and to formally des-
ignate the land at issue as part of the unincorporated com-
munity, there is no basis for requiring the county to deter-
mine whether petitioner's land permissibly may be added
to the unincorporated community. In response, LandWatch
defends LUBA's reasoning, asserting that LUBA permissi-
bly concluded that, as a functional matter, petitioner's pro-
posal would expand the Crooked River Ranch rural unin-
corporated community and that, as a result, the county was
required to evaluate whether the criteria in OAR 660-004-
0020(4) and OAR 660-004-0022(4) are satisfied.

We do not disagree with LUBA's conclusion that, in
one sense, petitioner's application proposes to expand the

---

[3] Notwithstanding the fact that inclusion of rural land within a designated
unincorporated community reduces certain impediments to its use for residential
or other urban purposes, given the particulars of its proposal, simply having its
land designated as part of the unincorporated community would not allow it to
use the land in the way that it proposes. Thus, one way or another, petitioner
would need to invoke the exceptions process.

Crooked River Ranch Community. If petitioner's application is approved, and petitioner follows through with the proposed development, there will be a new residential development within the interior of the community. Ultimately, however, that is not the issue. The issue is whether the approval of petitioner's application did anything to alter the lands designated as part of the Crooked River Ranch unincorporated community or that community's boundaries. Because it did not, OAR 660-004-0020(4) and OAR 660-004-0022(4) do not apply to petitioner's application.

As an initial matter, it is not entirely clear to us that the inclusion of petitioner's lands within the designated Crooked River Ranch unincorporated community would constitute an "expansion" of the unincorporated community within the meaning of OAR 660-004-0020(4). The land at issue falls within the interior of the outer boundary of the designated unincorporated community, and the inclusion of the land would not push the exterior boundary outward so as to enlarge the exterior footprint of the community. As a result, the inclusion of it may not result in an "expansion" under the rule. A common meaning of the word "expansion" is "the act or process of spreading out[.]" *Webster's Third New Int'l Dictionary* 798 (unabridged ed 2002). It is not implausible to think that the Land Conservation and Development Commission (LCDC) had that definition in mind when it adopted OAR 660-004-0020(4). That is because one purpose of identifying boundaries of both cities and unincorporated communities is to prevent sprawl. *See 1000 Friends*, 301 Or at 474 n 19 (collecting cases discussing the role of an urban growth boundary in preventing sprawl); Dept. of Land Conservation & Dev., *A Citizens Guide to the Oregon Coastal Management Program* at 13-14 (explaining that the goal of Oregon's land use program is to "encourage more compact, sustainable patterns of development," and that the recognition of unincorporated communities is consistent with that objective because it allows for "development rights in the extensive areas of existing rural development throughout the State, [while] limiting further development and expansion of those areas."). Adding land that is interior to an existing unincorporated community's boundary to the land designated as part of that community would not render

the community less compact or add to sprawl and, thus, may not constitute an "expansion" of the community under the rules.[4]

Ultimately, we need not in this case resolve the issue—an issue on which the input of LCDC would be important—of whether adding petitioner's land to the land designated as part of the unincorporated community would constitute an "expansion" of the community. That is for the simple reason that petitioner did not ask to have the land added to the lands designated as part of the unincorporated community, the county did not add those lands to those designated, and the county did not in any way change the boundaries—interior or exterior—of the community. Put another way, petitioner did not seek the land-use-development benefits that come from land being included within the boundary of an unincorporated community, and the county did not grant those benefits to petitioner. Instead, petitioner chose to invoke the goal exceptions process as the path toward obtaining approval of its proposed use of land.[5]

_____

[4] The dissenting opinion's reliance on alternative definitions of "expansion" is not to the contrary. 332 Or App at 333 (Tookey, J., dissenting). The dissenting opinion focuses on definitions for "expansion" as an increase in "size," or "extent," which, to the dissent, means that the two rules apply because the proposed development would increase the size or extent of the community so as to encroach on protected, rural land. *Id*. at 333-35 (Tookey, J., dissenting). "Size" is commonly understood to mean "physical magnitude, extent, or bulk: the actual, characteristic, normal, or relative proportion of a thing." *Webster's* at 2130. "Extent" is commonly understood to mean "the amount of space which something occupies or the distance over which it extends: the length, width, height, thickness, diameter, circumference or area of something : DIMENISONS, PROPORTIONS, SIZE, MAGNITUDE, SPREAD." *Id*. at 805. Here, there is no evidence that the proposed development will increase the physical magnitude or proportion or amount of space of Crooked River Ranch's exterior boundary; that is, the development will not increase the size or extent of the unincorporated community beyond its current exterior dimensions. Indeed, to increase in the community's boundaries in size or extent, the development would need to enlarge the community's zoned boundaries, or so it would be reasonable to conclude. *Cf. Schaefer v. Marion County*, 318 Or App 617, 627, 509 P3d 718 (2022) (holding that a "local government's act of adopting a map showing a [boundary] that is larger than the boundary shown on the previously adopted map is [an] act that increases the size of" the property). In any event, the fact that we are having this debate among ourselves is reason enough not to resolve the debate absent the input of LCDC—and judicially fix in place a potentially erroneous interpretation of an "expansion," where, as here, there is no need to reach the question for the simple reason that petitioner did not seek to have an "expansion" approved.

[5] We recognize that the inclusion of land within the boundary of an unincorporated community operates, in and of itself, as an exception, to the extent

Neither LandWatch nor LUBA has identified any source of law that required petitioner, in addition to pursuing the otherwise applicable exceptions process, to seek to have its land added to that designated as part of the unincorporated community, and it is unclear to us why LCDC would impose such a requirement on an applicant that, ultimately, sought permission to use its land in a way that would require exceptions, regardless of whether the land previously had been included within a designated unincorporated community. As noted, the LCDC rules governing unincorporated communities were adopted to make the development of lands in unincorporated communities less cumbersome than the existing exceptions process, not more.

The dissenting opinion reaches a different conclusion. As we understand the scope its reasoning, the dissenting opinion essentially concludes that any time an applicant, as here, seeks a land use approval for land uses on land adjacent to the boundary of an unincorporated community that are comparable to the uses existing in the unincorporated community, the applicant not only must demonstrate entitlement to any applicable exceptions, the applicant must demonstrate that the criteria for expanding an unincorporated community under OAR 660-004-0020(4) and OAR 660-004-0022(4) are also satisfied. In other words, under the dissenting opinion's view, more stringent land use approval requirements apply to rural land located on the boundary of an unincorporated community than rural land located elsewhere. The dissenting opinion reasons that if the expansion criteria are not applied, then that "would, in effect, allow for growth of urbanized areas outside of cities—i.e., unincorporated communities—without regard for the location considerations LCDC adopted in OAR 660-004-0020(4) or the other considerations LCDC adopted in OAR 660-004-0022(4)." 332 Or App at 336 (Tookey, J., dissenting).

That rationale—requiring a landowner to seek to add land to an existing unincorporated community as a

---

that the inclusion of land within a designated unincorporated community authorizes uses on that land that would not otherwise be permitted. *See* OAR 660-004-0020(4) (modifying "the reasons exception requirements necessary to address standards 2 through 4 of Goal 2, Part II (c), as described in subsections 2(b), (c), and (d) of this rule").

prerequisite to approval of urban uses—overlooks the fact that the Goal 14 exceptions process also operates to ensure that the approval of urban uses of a particular piece of land is appropriate in view of the surrounding land uses. As mentioned, the focus of Goal 14 is "[t]o provide for an orderly and efficient transition from rural to urban land use." *1000 Friends*, 292 Or at 739. Although expanding unincorporated community boundaries to include land that meets the criteria for inclusion is one way to ensure that orderly transition, so too is the exceptions process under OAR 660-014-0030 and OAR 660-014-0040. On that point, it is, again, worth remembering that LCDC promulgated the unincorporated community rules to create an alternative pathway to the goal exceptions process for approval of certain uses on rural land. As is typically the case with alternative pathways, they provide different ways to achieve the same overarching objective.

Specifically, as DLCD specifically advised the county, because petitioner's proposal requested two-acre lots, which qualify as an urban use, OAR 660-004-0040(7), "the county may not approve an exception to Goal 14 based on OAR chapter 660, division 4," but instead, "[i]n order to approve a Goal 14 exception, the county must find that the tests at either OAR 660-014-0030 or OAR 660-014-0040 have been met." (Underscoring in original.) DLCD noted that "the provisions of OAR 660-014-0040 are particularly difficult to satisfy in these types of instances. We advise that the provisions of OAR 660-014-0030 be considered."

As DLCD recognized, both OAR 660-014-0030 and OAR 660-014-0040 provide pathways for the development of urban uses on undeveloped rural land, and both, by their terms, impose demanding standards for approvals of the exception needed to allow for development on rural land. To get an exception under OAR 660-014-0030, an applicant must demonstrate that the land in question has become "irrevocably committed to urban levels of development" based on the "situation at the specific site." OAR 660-014-0030(2). Specifically, the rule provides, in full:

"(1)  A conclusion, supported by reasons and facts, that rural land is irrevocably committed to urban levels of development can satisfy the Goal 2 exceptions standard

(e.g., that it is not appropriate to apply Goals 14's requirement prohibiting the establishment of urban uses on rural lands). If a conclusion that land is irrevocably committed to urban levels of development is supported, the four factors in Goal 2 and OAR 660-004-0020(2) need not be addressed.

"(2)   A decision that land has been built upon at urban densities or irrevocably committed to an urban level of development depends on the situation at the specific site. The exact nature and extent of the areas found to be irrevocably committed to urban levels of development shall be clearly set forth in the justification for the exception. The area proposed as land that is built upon at urban densities or irrevocably committed to an urban level of development must be shown on a map or otherwise described and keyed to the appropriate findings of fact.

"(3)   A decision that land is committed to urban levels of development shall be based on findings of fact, supported by substantial evidence in the record of the local proceeding, that address the following:

"(a)   Size and extent of commercial and industrial uses;

"(b)   Location, number and density of residential dwellings;

"(c)   Location of urban levels of facilities and services; including at least public water and sewer facilities; and

"(d)   Parcel sizes and ownership patterns.

"(4)   A conclusion that rural land is irrevocably committed to urban development shall be based on all of the factors listed in section (3) of this rule. The conclusion shall be supported by a statement of reasons explaining why the facts found support the conclusion that the land in question is committed to urban uses and urban level development rather than a rural level of development.

"(5)   More detailed findings and reasons must be provided to demonstrate that land is committed to urban development than would be required if the land is currently built upon at urban densities."

OAR 660-014-0040 likewise imposes a demanding standard for urban-level development on rural land:

"(1)   As used in this rule, "undeveloped rural land" includes all land outside of acknowledged urban growth

boundaries except for rural areas committed to urban development. This definition includes all resource and non-resource lands outside of urban growth boundaries. It also includes those lands subject to built and committed exceptions to Goals 3 or 4 but not developed at urban density or committed to urban level development.

"(2)  A county can justify an exception to Goal 14 to allow establishment of new urban development on undeveloped rural land. Reasons that can justify why the policies in Goals 3, 4, 11 and 14 should not apply can include but are not limited to findings that an urban population and urban levels of facilities and services are necessary to support an economic activity that is dependent upon an adjacent or nearby natural resource.

"(3)  To approve an exception under section (2) of this rule, a county must also show:

"(a)  That Goal 2, Part II (c)(1) and (c)(2) are met by showing that the proposed urban development cannot be reasonably accommodated in or through expansion of existing urban growth boundaries or by intensification of development in existing rural communities;

"(b)  That Goal 2, Part II (c)(3) is met by showing that the long-term environmental, economic, social and energy consequences resulting from urban development at the proposed site with measures designed to reduce adverse impacts are not significantly more adverse than would typically result from the same proposal being located on other undeveloped rural lands, considering:

"(A)  Whether the amount of land included within the boundaries of the proposed urban development is appropriate, and

"(B)  Whether urban development is limited by the air, water, energy and land resources at or available to the proposed site, and whether urban development at the proposed site will adversely affect the air, water, energy and land resources of the surrounding area.

"(c)  That Goal 2, Part II (c)(4) is met by showing that the proposed urban uses are compatible with adjacent uses or will be so rendered through measures designed to reduce adverse impacts considering:

"(A) Whether urban development at the proposed site detracts from the ability of existing cities and service districts to provide services; and

"(B) Whether the potential for continued resource management of land at present levels surrounding and nearby the site proposed for urban development is assured.

"(d) That an appropriate level of public facilities and services are likely to be provided in a timely and efficient manner; and

"(e) That establishment of an urban growth boundary for a newly incorporated city or establishment of new urban development on undeveloped rural land is coordinated with comprehensive plans of affected jurisdictions and consistent with plans that control the area proposed for new urban development.

"(4) Counties are not required to justify an exception to Goal 14 in order to authorize industrial development, and accessory uses subordinate to the industrial development, in buildings of any size and type, in exception areas that were planned and zoned for industrial use on January 1, 2004, subject to the territorial limits and other requirements of ORS 197.713 and 197.714."

Moreover, Goal 11 offers an additional safeguard against disorderly, unplanned urbanization on rural lands by restricting the extension of water and sewer systems to rural lands. OAR 660-011-0060 (sewer); OAR 660-011-0065 (water). The requirement of compliance with Goal 11, or the justification of an exception, likewise helps to ensure that the approval of a proposal will not alter the rural character of subject lands in a way that is inconsistent with Oregon's land use goals.

Given the stringency of those standards, we are not persuaded that LCDC intended for a landowner who can satisfactorily demonstrate the application of an exception under OAR 660-014-0030 or OAR 660-014-0040 (as well as compliance with Goal 11 or demonstration of an applicable exception) must also demonstrate that the land satisfies the criteria to be added to an unincorporated rural community as a prerequisite to approving urban uses on the land, simply because it happens to border an unincorporated rural

community. At a minimum, we think LCDC would have been explicit about any such requirement, particularly in view of the fact that the unincorporated community rules were promulgated to make development of rural land easier, rather than harder.

In sum, in this case, petitioner's application did not ask the county to add its land to the designated unincorporated community in the comprehensive plan or to alter the boundaries of the existing unincorporated community. For that reason, OAR 660-004-0020(4) and OAR 660-004-0022(4) do not apply to petitioner's application, and LUBA erred in requiring the county to evaluate petitioner's application under the criteria in those rules.[6]

As noted above, in connection with its argument that the application was authorized as an expansion of the rural unincorporated community, LandWatch also argued that its substantial rights had been prejudiced by the county's failure to provide adequate notice that petitioner's application did not propose an expansion. LUBA did not reach that argument, having concluded that the application did propose an expansion. We therefore reverse and remand for LUBA to consider that argument.

Reversed and remanded as to the determination that the county must apply OAR 660-004-0020(4) and OAR 660-004-0022(4) to petitioner's application; otherwise affirmed.

**TOOKEY, P. J.,** concurring in part, dissenting in part.

This case presents an important issue regarding land use in Oregon: whether a county is required to consider the rules that LCDC has adopted to limit the expansion of unincorporated communities when a developer does not

---

[6] To the extent that the approval of petitioner's application results in a change to the character of the use of petitioner's land in a way that calls into question the initial decision to exclude it from the Crooked River Ranch rural unincorporated community, that may be the sort of change in circumstance contemplated by OAR 660-022-0020(1), allowing for the county to exercise its discretion to amend the designation of the boundaries of the Crooked River Ranch rural unincorporated community. We express no opinion on the criteria that might apply to the exercise of that discretion.

formally request the expansion of an unincorporated community's boundaries, but its planned multi-unit residential development will functionally be a part of the unincorporated community, as described below.

I think that the answer to that question is yes; that is, in my view, LCDC intended that the rules limiting the expansion of unincorporated communities apply even if such a developer does not formally request an expansion of the unincorporated community's boundaries. Therefore, I respectfully dissent.

As an initial matter, I note that I agree with the majority's analysis and disposition with regard to petitioner Mac Investment, Inc.'s first and third assignments of error. Those two assignments assert that LUBA's order is unlawful in substance because LUBA "ignored petitioner's preservation arguments" and "improperly found that all of the county's findings failed the *Gonzalez v. Lane County*[, 24 Or LUBA 251 (1992),] test, and further failed to more narrowly consider the county's alternative irrevocably committed findings."

Regarding those two assignments, I agree with the majority that LUBA did not err "as a matter of substance or procedure when it remanded the entire case to the county to supply adequate findings and statements of reasons." 332 Or App at 310.

I write separately because I do not agree with the majority's analysis and disposition with regard to petitioner's second assignment of error; that is, I disagree that LUBA erred when it determined "that the county must apply OAR 660-004-0020(4) [(Goal 2, Part II(c), Exception Requirements)] and OAR 660-004-0022(4) [(Reasons Necessary to Justify an Exception Under Goal 2, Part II(c))] to petitioner's application" because "the approval of petitioner's application did [not do] anything to alter the lands designated as part of the Crooked River Ranch unincorporated community or that community's boundaries."[1] 332 Or App at 313-14.

---

[1] As described below, LCDC's rules related to unincorporated communities are largely set forth in OAR chapter 660, division 22. Two rules in OAR chapter 660, division 4, which concern interpretation of the Goal 2 exception process, contain requirements that are specifically applicable to the "expansion" of unincorporated communities—OAR 660-004-0020(4) and OAR 660-004-0022(4). For

I would affirm LUBA's determination that petitioner plans to carry out "a *de facto* expansion of the Crooked River Ranch Community without demonstrating compliance with OAR 660-004-0020(4) and OAR 660-004-0022(4), even though [petitioner] and the county do not characterize it as such an expansion," and that the county, therefore, must consider the criteria set forth in OAR 660-004-0020(4) and OAR 660-004-0022(4) in considering petitioner's application.

At issue in petitioner's second assignment of error is whether the county was required to consider OAR 660-004-0020(4) and OAR 660-004-0022(4) when approving petitioner's application for a comprehensive plan map amendment and zone change for 142.5 acres of land located in Jefferson County (the Subject Property). As indicated above, LUBA concluded that the county was so required, because the development planned by petitioner constituted an expansion of the Crooked River Ranch unincorporated community (the Ranch). Petitioner claims that LUBA's conclusion was unlawful in substance because it represents a mistaken interpretation of the appliable law. *Schaefer v. Marion County*, 318 Or App 617, 620, 509 P3d 718 (2022) (noting an order is unlawful in substance if it represents "a mistaken interpretation of the applicable law" (internal quotation marks omitted)). As explained below, I disagree with petitioner and the majority.

## I.   THE RANCH, THE SUBJECT PROPERTY, AND THE PLANNED DEVELOPMENT

I begin with a brief description of the Ranch, the Subject Property, and the planned development, before turning to LCDC's rules concerning unincorporated communities and why, in my view, LUBA was correct that the county was required to consider OAR 660-004-0020(4) and OAR 660-004-0022(4) before approving petitioner's application.

### A.   *The Ranch*

The Ranch is a rural "unincorporated community" and is recognized as such in the Jefferson County Comprehensive Plan (JCCP). OAR 660-022-0010(10) (defining

purposes of this opinion, I refer to LCDC's rules related to unincorporated communities as a whole as the "unincorporated communities rules."

"unincorporated community"). The Ranch presently contains the largest amount of rural residential land in Jefferson County, sitting on approximately 7,420 acres.

The Ranch was originally platted approximately half a century ago, and zoning regulations for the Ranch were established over 30 years ago in 1987. As of now, the Ranch is primarily zoned as Crooked River Ranch Residential. Under that zoning, new residential lots are required to have a minimum lot size of 10 acres, Jefferson County Zoning Ordinance (JCZO) § 318(F), but the Ranch includes many smaller lots that have been developed over the years. The JCZO also provides that, generally, a variance to Jefferson County zoning provisions—such as the provision setting forth minimum lot sizes for new development in the Crooked River Ranch Rural Residential zone—"shall not be granted to *** decrease the minimum lot size." *Id.* § 508.1.

In total, there are approximately 2,300 parcels in the Ranch zoned as Crooked River Ranch Residential, and 93 percent of those parcels are developed. A smaller portion of the Ranch is zoned as Crooked River Ranch Commercial, where, among other uses, retail, restaurants, and professional services are permitted. *Id.* § 317.

The Ranch has its own fire and rescue department (CRR Fire and Rescue), and it has water provided by Crooked River Ranch Water Company (CRR Water Company), which operates a community water system on portions of the Ranch. Further, in accordance with the JCCP, the Board of Commissioners of Jefferson County has appointed the Crooked River Ranch Association Board to act as a "Community Planning Advisory Committee" for the Ranch. In that capacity, it is charged with, among other tasks, providing "input and recommendations on proposed land use activities."

B.   *The Subject Property and the Planned Development*

The Subject Property, which is owned by petitioner Mac Investments, Inc., consists of 142.5 acres and sits in the middle of the Ranch. The Subject Property is entirely surrounded by the Ranch on all four sides.

The Subject Property was not included in the Ranch plat when the Ranch was first platted approximately half a century ago because, at that time, the land was owned by the United States Forest Service. In 1989, the Subject Property was acquired by a private party from the federal government with the intent of developing the property as part of the Ranch.

As it sits today, the Subject Property is designated and zoned as "Range Land." Under the JCCP, permissible uses for range land include "low density grazing, dry land agriculture, forestry, open space and wildlife habitat." Petitioner seeks to change the designation to "Rural Land," which is land outside of an urban growth boundary that is "not protected as farm, range or forest land." It also seeks to have the Subject Property zoned as "Rural Residential 2," which will allow the Subject Property to be used for residential development on two-acre lots, notwisthanding that new residential development in Crooked River Ranch must have a minimum lot size of 10 acres under Jefferson County's zoning ordinance. Petitioner's plan for the Subject Property, as described in its application, is to develop the property for residential uses.

I highlight that, during these land use proceedings, petitioner has been explicit that it intends for its residential development, when complete, "to functionally be a part of [the Ranch] community." Petitioner intends, for example, that houses on the subject property will be part of the Crooked River Ranch Homeowners Association, and for owners of residential lots to pay dues to supplement the Ranch's road maintenance budget. Petitioner also intends to have fire protection services for the residential development provided by CRR Fire and Rescue, and to have water supplied by CRR Water Company.

But notwithstanding that its planned residential development will functionally be a part of the Ranch, petitioner's application did not seek for the county to expand the boundary of the Ranch in the JCCP to include the planned residential development. When, in the proceedings below, questions were raised "as to why the Subject Property is not being included" in the Ranch, petitioner explained, in

part, that "joining land to an unincorporated community is difficult."

Furthermore, petitioner also noted that the Subject Property has "undoubtedly been historically considered to be part of the [Ranch] community."

## II.   LCDC'S UNINCORPORATED COMMUNITIES RULES

The LCDC rules that LUBA concluded the county must consider, OAR 660-004-0020(4) and OAR 660-004-0022(4), are set forth in full below and are a part of Oregon's regulatory scheme for land use planning related to the development of unincorporated communities. LCDC's rules related to unincorporated communities are largely set forth in OAR chapter 660, division 22. That division defines unincorporated communities as "settlements" with certain characteristics:

"'Unincorporated Community' means a settlement with all of the following characteristics:

"(a) It is made up primarily of lands subject to an exception to Statewide Planning Goal 3, Goal 4 or both;

"(b) It was either identified in a county's acknowledged comprehensive plan as a 'rural community,' 'service center,' 'rural center,' 'resort community,' or similar term before this division was adopted (October 28, 1994), or it is listed in the Department of Land Conservation and Development's January 30, 1997, 'Survey of Oregon's Unincorporated Communities';

"(c)   It lies outside the urban growth boundary of any city;

"(d)   It is not incorporated as a city; and

"(e)   It met the definition of one of the four types of unincorporated communities in sections (6) through (9) of this rule, and included the uses described in those definitions, prior to the adoption of this division (October 28, 1994)."

OAR 660-022-0010(10). The unincorporated communities rules further provide a definition for "rural communities,"

OAR 660-022-0010(7), such as the Ranch, which is a specific type of unincorporated community:

> "'Rural Community' is an unincorporated community which consists primarily of permanent residential dwellings but also has at least two other land uses that provide commercial, industrial, or public uses (including but not limited to schools, churches, grange halls, post offices) to the community, the surrounding rural area, or to persons traveling through the area."

The unincorporated communities rules require that county comprehensive plans "designate and identify unincorporated communities in accordance with the definitions in OAR 660-022-0010," and provide that counties "may amend these designations as circumstances change over time." OAR 660-022-0020(1). Further, the rules require that counties "establish boundaries of unincorporated communities in order to distinguish lands within the community from exception areas, resource lands and other rural lands." OAR 660-022-0020(2). The rules also contain sections on the planning and zoning of unincorporated communities, OAR 660-022-0030; the adoption of "public facility plans" for unincorporated communities, OAR 660-022-0050, *see also* OAR ch 660, div 011 (setting forth requirements for public facilities planning); and coordination and citizen involvement for unincorporated community planning, OAR 660-022-0060.

The unincorporated communities rules were created in response to the Supreme Court's decision in *1000 Friends of Oregon v. LCDC*, 301 Or 447, 724 P2d 268 (1986), which held that urban uses are not permitted outside of urban growth boundaries unless an exception to Goal 14 is taken or the use is compliant with Goal 14. The rules interpret Statewide Land Use Planning Goal 11 and Goal 14, which concern urban and rural development outside urban growth boundaries, and operate "to regulate development as well as services and facilities, to coordinate development levels with service and facility levels[,] and *** to channel intensive uses and development to existing urban and urbanizable land first before allowing the conversion of or intense non-resource uses on the rural land that comprises

the areas outside [urban growth boundaries]." *Gisler v. Deschutes County*, 149 Or App 528, 535, 945 P2d 1051 (1997).

OAR chapter 660, division 22, concerning unincorporated communities was

> "[c]reated with the intent of expediting the planning process concerning unincorporated communities, *i.e.* lawfully urbanized areas outside cities, which thus lacked urban growth boundaries. The purpose of the new division was to *recognize the existence of those areas* without imposing nonconforming use disabilities on those uses and, *in some instances*, to allow for their growth."

Edward J. Sullivan, *Urbanization in Oregon: Goal 14 and the Urban Growth Boundary*, 47 Urb Law 165, 201 n 86 (2015) (emphases added); *see also* OAR 660-022-0000(1) ("The purpose of this division is to establish a statewide policy for the planning and zoning of unincorporated communities that recognizes the importance of communities in rural Oregon. It is intended to expedite the planning process for counties by reducing their need to take exceptions to statewide planning goals when planning and zoning unincorporated communities."). That is, the unincorporated communities "rules allow for *limited expansion and development* that would not otherwise have been permitted under Goals 11 and 14, and allow those activities *in accordance with the classification of the community* (*e.g.*, resort, rural, rural center, urban)." Edward J. Sullivan and Benjamin H. Clark, *A Timely, Orderly and Efficient Arrangement of Public Facilities and Services—The Oregon Approach*, 49 Willamette L Rev 411, 453 (2013) (emphases added).

Consistent with the purpose of expediting the planning process for unincorporated communities, Goal 14 provides that development within unincorporated communities that is more intensive than that allowed on rural lands need not take a Goal 11 or Goal 14 exception *if* such development is provided for by LCDC rules:

> "In unincorporated communities outside urban growth boundaries counties may approve uses, public facilities and services more intensive than allowed on rural lands by Goal 11 and 14, either by exception to those goals, or as provided by commission rules which ensure such uses do

not adversely affect agricultural and forest operations and interfere with the efficient functioning of urban growth boundaries."

Nevertheless, OAR 660-004-0018(2)(c), limits permissible uses in unincorporated communities when certain types of goal exceptions are taken, unless other provisions of OAR 660-004-0018(2) apply. As relevant, OAR 660-004-0018(2) provides:

"For 'physically developed' and 'irrevocably committed' exceptions to goals, residential plan and zone designations shall authorize a single numeric minimum lot size and all plan and zone designations shall limit uses, density, and public facilities and services to those that satisfy (a) or (b) or (c) * * *:

"* * * * *

"(c)   For uses in unincorporated communities, the uses are consistent with OAR 660-022-0030, 'Planning and Zoning of Unincorporated Communities', if the county chooses to designate the community under the applicable provisions of OAR chapter 660, division 22[.]"[2]

Further, consistent with the above noted observation that unincorporated communities lack urban growth boundaries and that the unincorporated communities rules, in some instances, allow for their growth, LCDC has promulgated rules both governing and limiting the expansion of unincorporated communities. Counties may expand the

---

[2]  OAR 660-004-0018(2)(a), (b), and (d) provide:

"(a)   That are the same as the existing land uses on the exception site;

"(b)   That meet the following requirements:

"(A)   The rural uses, density, and public facilities and services will maintain the land as 'Rural Land' as defined by the goals, and are consistent with all other applicable goal requirements;

"(B)   The rural uses, density, and public facilities and services will not commit adjacent or nearby resource land to uses not allowed by the applicable goal as described in OAR 660-004-0028; and

"(C)   The rural uses, density, and public facilities and services are compatible with adjacent or nearby resource uses;

"* * * * *

"(d)   For industrial development uses and accessory uses subordinate to the industrial development, the industrial uses may occur in buildings of any size and type provided the exception area was planned and zoned for industrial use on January 1, 2004, subject to the territorial limits and other requirements of ORS 197.713 and 197.714."

boundaries of existing unincorporated communities, but "any expansion including uses not allowed by the applicable goals must include a Goal 2, Part II(c), exception based on a 'demonstrated need,' as described in OAR 660-004-0022." *Polk County v. DLCD*, 217 Or App 521, 530-31, 176 P3d 432, *rev den*, 345 Or 317 (2008); *see also Wetherell v. Douglas County*, 57 Or LUBA 240, 245 (2008) (explaining that "OAR 660-004-0020(4) modifies three of the exception requirements set out at OAR 660-004-0022(2), for reasons exceptions to expand a rural or urban unincorporated community" (footnote omitted)). As noted, OAR 660-004-0022(4) is one of the rules that LUBA held the county must consider in this case. That rule also sets forth specific considerations when an unincorporated community is expanded to allow for residential development, and requires a "demonstrated ability" to serve the expansion area with necessary facilities.

Specifically, OAR 660-004-0022(4) provides:

"For *the expansion of an Unincorporated Community* defined under OAR 660-022-0010(10) the requirements of subsections (a) through (c) of this section apply:

"(a)   Appropriate reasons and facts may include findings that there is *a demonstrated need* for additional land in the community to accommodate a specific rural use based on Goals 3-19 and a demonstration that either:

"(A)   The use requires a location near a resource located on rural land; or

"(B)   The use has special features necessitating its location in an expanded area of an existing unincorporated community, including:

"(i)   For industrial use, it would have a significant comparative advantage due to its location such as, for example, that it must be near a rural energy facility, or near products available from other activities only in the surrounding area, or that it is reliant on an existing work force in an existing unincorporated community;

"(ii)   *For residential use, the additional land is necessary to satisfy the need for additional housing in the community* generated by existing industrial, commercial, or other economic activity in the surrounding area. The plan must include an economic analysis showing why the type and

density of planned housing *cannot be accommodated in an existing exception area or urban growth boundary*, and is most appropriate at the particular proposed location. The reasons cannot be based on market demand for housing, nor on a projected continuation of past rural population distributions.

"(b)   The findings of need must be coordinated and consistent with the comprehensive plan for other exception areas, unincorporated communities, and urban growth boundaries in the area. For purposes of this subsection, 'area' includes those communities, exception areas, and urban growth boundaries that may be affected by an expansion of a community boundary, taking into account market, economic, and other relevant factors.

"(c)   *Expansion of the unincorporated community boundary requires a demonstrated ability to serve both the expanded area and any remaining infill development potential in the community, at the time of development, with the level of facilities determined to be appropriate for the existing unincorporated community.*"

(Emphases added.)

The other rule that LUBA held to be applicable, OAR 660-004-0020(4), describes the prioritization of land to be included when taking an exception to expand an unincorporated community. It provides:

"For the expansion of an unincorporated community described under OAR 660-022-0010, *** the reasons exception requirements necessary to address standards 2 through 4 of Goal 2, Part II(c), as described in of subsections (2)(b), (c) and (d) of this rule, are modified to also include the following:

"(a)   Prioritize land for expansion: First priority goes to exceptions lands in proximity to an unincorporated community boundary. Second priority goes to land designated as marginal land. Third priority goes to land designated in an acknowledged comprehensive plan for agriculture or forestry, or both. Higher priority is given to land of lower capability site class for agricultural land, or lower cubic foot site class for forest land; and

"(b)   Land of lower priority described in subsection (a) of this section may be included if land of higher priority is

inadequate to accommodate the use for any one of the following reasons:

"(A)   Specific types of identified land needs cannot be reasonably accommodated on higher priority land;

"(B)   Public facilities and services cannot reasonably be provided to the higher priority area due to topographic or other physical constraints; or

"(C)   Maximum efficiency of land uses with the unincorporated community requires inclusion of lower priority land in order to provide public facilities and services to higher priority land."

Taken as a whole, LCDC's rules concerning unincorporated communities set forth a detailed regulatory scheme for development of rural communities in accordance with Oregon's statewide land use goals, and include rules limiting and guiding the expansion of unincorporated communities, OAR 660-004-0020(4) and OAR 660-004-0022(4).

### III.   LUBA'S ORDER WAS NOT UNLAWFUL IN SUBSTANCE

As noted, at issue in this proceeding is whether the county had to consider the criteria set forth in OAR 660-004-0020(4) and OAR 660-004-0022(4) related to the expansion of unincorporated communities before approving petitioner's application. LUBA concluded that it did, and petitioner claims that LUBA's conclusion was unlawful in substance, because it represents a mistaken interpretation of appliable law.

In contending that LUBA erred, petitioner asserts that its application "did not expand the [the Ranch] unincorporated community specifically because the subject [a]pplication did not seek to amend the JCCP to adjust the boundaries of the [Ranch] unincorporated community." Petitioner notes that it could have "submitted a land use application seeking to formally expand the [Ranch] unincorporated community," but that it chose not to do so.

In respondent LandWatch's view, LUBA did not err. As respondent LandWatch sees it, concluding that OAR 660-004-0020(4) and OAR 660-004-0022(4) do not apply

would "frustrate the statewide policy of LCDC's unincorporated communities rules by allowing land use applicants to functionally expand an unincorporated community, but without calling it an expansion of an unincorporated community and without applying the rules that LCDC enacted to guide such expansions."

When, as here, our review requires interpretation of an administrative rule, "we seek to divine the intent of the rule's drafters, employing essentially the same framework that we employ when interpreting a statute." *Schaefer*, 318 Or App at 622. Under that analytical framework, "we consider the text of the rule in its regulatory and statutory context." *Id.* (internal quotation marks omitted).

Both of the rules at issue, OAR 660-004-0020(4) and OAR 660-004-0022(4), by their terms, apply to "the expansion of an Unincorporated Community." *See also Polk County*, 217 Or App at 530-31 (noting "*any expansion* [of an unincorporated community] including uses not allowed by the applicable goals *must include* [an] exception based on a 'demonstrated need,' as described in OAR 660-004-0022" (emphases added)). Neither rule defines the word "expansion," but common definitions of "expansion" include "the act or process of increasing in extent, size, number, volume, or scope" and "the act or process of spreading out." *Webster's Third New Int'l Dictionary* 798 (unabridged ed 2002). Thus, it appears to me that, textually, those rules are applicable where an exception is taken for development that would cause an unincorporated community to increase in "size" or "extent," or "spread out."

That understanding of when OAR 660-004-0020(4) and OAR 660-004-0022(4) apply is supported by context. As described above, unincorporated communities are lawfully urbanized areas outside cities, which lack urban growth boundaries, and LCDC has promulgated specific rules to govern and limit their growth—OAR 660-004-0020(4) and OAR 660-004-0022(4). Those communities are, in a sense, anomalies in Oregon land use law, which exist as a result of certain historical facts. *See* OAR 660-022-0010(10)(b) (for a settlement to be an unincorporated community it must have been identified in a specific manner in a county's

comprehensive plan before October 28, 1994, or "listed in the Department of Land Conservation and Development's January 30, 1997, 'Survey of Oregon's Unincorporated Communities'"); Sullivan, 47 Urb Law at 201 (purpose of unincorporated communities rules was, in part, to recognize the existence of such communities). Under the unincorporated communities rules, to expand an unincorporated community for residential development, consideration should be given to whether such expansion is needed, OAR 660-004-0022(4)(a)(B)(ii), and there are priorities set for what land should be used to expand the community, OAR 660-004-0020(4).

Thus, as I understand OAR 660-004-0020(4) and OAR 660-004-0022(4), they are intended to operate to both limit and direct the growth of unincorporated communities which, by their nature, do not have urban growth boundaries—that is, those rules are to apply when the "size" or "extent" of the unincorporated community increases, or the unincorporated community "spreads out"; either way, they are intended to apply when the community further encroaches on protected, rural land, and to guide that encroachment.

With that understanding of the common meaning of "expansion" and the purpose of OAR 660-004-0020(4) and OAR 660-004-0022(4), it seems to me that petitioner is seeking an "expansion" of the Ranch unincorporated community within the meaning of OAR 660-004-0022(4) and OAR 660-004-0020(4). As noted, an unincorporated community such as the Ranch is a "settlement" with certain characteristics. OAR 660-022-0010(10). And as described above, the planned development will functionally be a part of the Ranch settlement: The planned development will add 142.5 acres of residential development to the Ranch. *See* OAR 660-004-0022 (4)(a)(B)(ii) (setting forth considerations when taking exception to expand an unincorporated community for residential development). Further, residents of the planned development will be members of the Crooked River Ranch Homeowners Association, will have fire protection services provided by CRR Fire and Rescue, and they will have water supplied by CRR Water Company. *See* OAR 660-004-0022(4)(c) (requiring that, to take a goal exception to expand an

unincorporated community, there must an ability to serve the expanded area with necessary facilities). Moreover, in addition to functionally being a part of the Ranch settlement, the planned development will have characteristics of land within a rural unincorporated community: it will consist of Goal 3 exception land that lies outside of an urban growth boundary and outside of a city, and it will be primarily used for residential development. OAR 660-022-0010(10) (among characteristics for an unincorporated community are that it is a "settlement" that is "made up primarily of lands subject to an exception to Statewide Planning Goal 3, Goal 4 or both," that "lies outside the urban growth boundary of any city" and "is not incorporated as a city"); OAR 660-022-0010(7) (defining "rural community," in part, as an "unincorporated community which consists primarily of permanent residential dwellings").

I am not persuaded by petitioner's argument that the development will not expand the Ranch simply because the "[a]pplication did not seek to amend the JCCP to adjust the boundaries of the [Ranch] unincorporated community." As an initial matter, nothing in the text of OAR 660-004-0020(4)—which, as noted, sets forth the priority of land when expanding unincorporated communities—references expansion of the "boundaries" designated in a county's comprehensive plan. Further, although the analysis required by OAR 660-004-0022(4)(b) and (c) reference a "boundary" expansion, the analysis under OAR 660-004-0022(4)(a), which sets forth a specific analysis when an expansion includes planned residential development, as petitioner's development does, does not reference boundaries. Thus, as a textual matter, I see no reason to discern that LCDC did not intend for counties to at least consider the criteria provided for in OAR 660-004-0020(4) and OAR 660-004-0022(4)(a) in circumstances such as these, *i.e.*, where an unincorporated community will, as a factual matter, be expanded to accommodate additional residential development that will functionally be a part of the unincorporated community, even though a developer has not sought to "formally" request a boundary expansion.

Moreover, petitioner's reading of OAR 660-004-0020(4) and OAR 660-004-0022(4)—*i.e.*, that they only apply where a developer formally requests a county change an unincorporated community's boundaries—would, in effect, allow for growth of urbanized areas outside cities—*i.e.*, unincorporated communities—without regard for the location considerations LCDC adopted in OAR 660-004-0020(4) or the other considerations LCDC adopted in OAR 660-004-0022(4). I also think that concluding that these two rules do not apply in this situation leads to a result that LCDC did not envision when it adopted these rules that only allow for the expansion of unincorporated communities in certain circumstances.

Two final points bear emphasis. First, OAR 660-022-0020(1) requires counties to identify and designate unincorporated communities as defined in OAR 660-022-0010(10), and OAR 660-022-0020(2) requires counties to then "establish boundaries of unincorporated communities in order to distinguish lands within the community from exception areas, resource lands and other rural lands." Given that scheme for identification, designation, and boundary establishment, I understand that LCDC, generally speaking, intended that community boundaries be defined by the size of the unincorporated community; that is, unincorporated community boundaries are not just arbitrary lines but were intended to actually reflect community size. That understanding is consistent with the understanding of unincorporated communities set forth above: that they are, in a sense, anomalies in Oregon land use law, which exist as a result of certain historical facts.

Second, the development that petitioner Mac Investments, Inc., intends to create—residential development on two acre lots—is a greater intensity of use than would be allowed under Crooked River Ranch Rural Residential zoning, which, as noted, requires new residential development to have a minimum lot size of 10 acres. Put another way, the residential development that Mac Investments, Inc., intends to create in the center of the Ranch is not allowed under the zoning requirements that are applicable to residential development within the Ranch.

For the reasons above, I respectfully dissent, and would affirm LUBA's conclusion that the county was required to consider the criteria set forth at OAR 660-004-0020(4) and OAR 660-004-0022(4) applicable to the expansion of an unincorporated community. Petitioner's planned development, in my view, seeks to expand the Ranch without regard for the rules LCDC adopted to guide such expansion.